Roger BUSCH, Tonia Busch, and Noble Metal Merchants, Inc., Plaintiffs–Appellants,

v.

DYNO NOBEL, INC., Dyno Industries USA, Inc., Dyno Industries A/S, and John Does 1 Through 10, Defendants–Appellees.

No. 00–1808.

United States Court of Appeals, Sixth Circuit.

July 18, 2002.

Before DAUGHTREY and MOORE, Circuit Judges, and ECONOMUS *, District Judge.

DAUGHTREY, Circuit Judge.

This appeal arose from a series of dealings between plaintiff Noble Metal Merchants, Inc. (Noble Metal), an antifreeze recycling company, and defendant Dyno Nobel, Inc. (Dyno), an explosives manufacturer. The two parties entered into a joint venture to produce ethylene glycol, including the design and development of a plant to provide an economical manufacturing process. In the process of negotiation, the parties signed a letter of intent that set out the basic plan for the project but that expressly contemplated a later contract. However, a formal contract was never executed. After the new plant was built by the plaintiff to the defendant's specifications, significant technical problems in the manufacturing process developed. The defendant then refused to continue working with the plaintiff, and the plaintiff filed this action, claiming breach of contract.

The case went to trial and the district court granted judgment as a matter of law to the defendant after the presentation of the plaintiff's case, finding that the original letter of intent was an unenforceable "agreement to agree" for the sale of goods. The plaintiff appeals that ruling, along with a variety of pretrial determinations made by the district court.

After examining the letter of intent and the additional evidence presented at trial, we conclude that the district court erred in granting judgment to the defendant as a

---

* The Hon. Peter C. Economus, United States District Judge for the Northern District of Ohio, sitting by designation.

matter of law. The facts presented at trial were sufficient to create several genuine issues of fact for the jury—issues that might reasonably have led to recovery for the plaintiff. Additionally, we conclude that the trial court violated the mandate of *Daubert* by denying the plaintiff a hearing before excluding the testimony of its damages expert. *See Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 588, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Accordingly, we reverse the judgment of the district court and remand the case for further proceedings.

## FACTUAL AND PROCEDURAL HISTORY

In 1993, when the dealings between the plaintiff and defendant began, Noble Metal was a small company located in Wixom, Michigan, in the business of selling scrap metal and recycling antifreeze. David Fincher, the Vice President of Special Projects for Dyno, contacted a representative of the Noble Metal, expressing an interest in purchasing ethylene glycol, a component of antifreeze. After a series of discussions, Fincher requested that Roger Busch, the owner and president of Noble Metal, talk to one of the defendant's engineer.

Busch was soon thereafter contacted by Pierre Smith, a Dyno process engineer. Smith explained to Busch that the defendant was interested in distilling the plaintiff's recycled antifreeze in order to obtain ethylene glycol sufficiently pure to use for explosives manufacturing. Smith told Busch that Dyno wanted to purchase approximately five million pounds of ethylene glycol. Busch expressed excitement at the possibility of serving as the defendant's source, but also voiced concern that producing such a large order would prevent him from adequately servicing his existing customers.

After receiving information about the plaintiff's plant, Smith created a preliminary design of a plant capable of producing ethylene glycol pure enough to meet the defendant's needs. Smith predicted that the use of this process to manufacture ethylene glycol at the plaintiff's new facility could save the defendant up to ten cents per pound of ethylene glycol. Despite projected savings, several Dyno employees internally expressed opposition to the project. Walt Elston, the defendant's executive vice president, briefly halted the project, but it was soon thereafter reinstated by Fincher.

Smith informed Busch that in order to make Noble Metals's plant capable of producing the necessary purity he would need to install a 50–horsepower boiler. In March 1994, Busch was provided the opportunity to purchase an even larger capacity boiler at a discounted rate. He informed Smith of the boiler purchase, after which Smith altered the plant design to allow a larger output of refined ethylene glycol for the defendant's use.

In June 1994, Smith completed the plant design. He was told by his supervisor, Al Osborne, to hold off on plant construction until the project was approved by Dyno executives. On August 30, 1994, Smith presented the designs to Elston, Fincher, Osborne, and Gary Lindsay, Dyno's chief executive officer. Elston and Fincher debated the viability of the project and, at the conclusion of the discussion, Lindsay "basically sided with Mr. Fincher" and directed Smith to go forward with the plant project.

Shortly thereafter, Fincher went to Wixom to tour the plaintiff's plant. Afterwards, he met with Busch, Rosen, and Frank Wolicki, the plaintiff's accountant, to discuss the viability of an agreement. Busch and Rosen testified that the parties

established the terms of their future relationship during that meeting. First, the plaintiff would supply its existing technology and front the cost of building a plant appropriate for the manufacture of ethylene glycol. In building the plant, the plaintiff would receive technical assistance, employee training, and some of the necessary equipment currently in the defendant's possession. After the plant was complete, the plaintiff would provide ethylene glycol to the defendant, recovering the price of plant construction by charging a premium equal to the cost of plant production divided by the number of pounds to be provided on the ethylene glycol purchases in the first five years. In each of the first five years, the plaintiff would supply the defendant with ten million pounds of ethylene glycol, reserving the remainder of the plant's output for existing customers. Rosen testified that the defendant "wanted as much as we could make, but we agreed to ten million." The negotiated purchase price was plaintiff's costs plus 15 percent. After five years, the plant would belong entirely to the plaintiff, and the parties would decide each year whether to continue the relationship.

Busch told Fincher that in order to secure a loan for plant construction, he would need their agreement in writing. Fincher offered to have Dyno's legal department prepare an appropriate contract. Busch suggested instead that the document be entitled a "letter of intent." Busch testified that he preferred this label because he thought it would be a "two- or three-page document that kept everybody focused on what everybody was supposed to do."

Busch received a draft of the letter of intent from the defendant in September. After reading it, he asked Fincher about the meaning of several provisions, including the wording of the introductory paragraph. Busch also suggested changes, but he did not consult a lawyer. Fincher sent Busch a signed final version of the letter of intent on September 26, 1994. On September 28, 1994, Busch sent Fincher two facsimile transmissions. Each fax included a cover sheet and a spreadsheet outlining the costs of producing ethylene glycol for the first two years. Busch testified that he sent the faxes to "confirm .. [his] understanding of how costs would be calculated." Fincher did not respond to the faxes. On September 30, 1994, Busch signed the September 26th letter of intent on behalf of the plaintiff and faxed it to Fincher.

The language of the letter of intent signed by both parties contemplates a later document:

> Counsel for the parties hereto shall promptly prepare a definitive agreement (the "Agreement"), acceptable in form and substance to Coolant Merchants and DYNO, which will included terms and conditions customary or appropriate to a transaction of this kind....

However, Busch testified at trial that neither Fincher nor anyone else ever mentioned drafting or executing another document. He further testified that when he asked Fincher about the "legal language" in the document, Fincher assured him that the document evidenced the agreement they had previously reached. The letter also refers to specifications for the ethylene glycol to be attached in "Exhibit A." However, no exhibit A was ever attached to the letter of intent. Busch testified that he later received product specifications that he believed were those contemplated in the letter of intent.

In order to secure the construction loan, Busch gave a copy of the letter of intent to the plaintiff's commercial loan officer at the National Bank of Detroit, Susan Taylor. Taylor testified that before she com-

pleted the loan to the plaintiff, she "wanted to make sure Dyno was committed to the deal." After receiving a copy of the letter of intent from Busch, Taylor had two conversations with a Dyno representative. Taylor was unable to recall the name of the employee to whom she spoke, but testified that she had taken the name and telephone number of the person she contacted from the Dyno letterhead that she had received in conjunction with the project loan proposal. Taylor identified herself to the Dyno employee and explained that she was calling in reference to the construction loan. She then reviewed the letter of intent with the Dyno officer, explaining that her understanding of the letter was that defendant was committed to purchasing ten million pounds of ethylene glycol per year for five years. The price would be the plaintiff's total production costs[1] plus 15 percent. At the end of the five year period, the plant would belong entirely to the plaintiff. She testified that the person with whom she spoke told her that Dyno was "going to provide whatever technical assistance Roger needed to design the plant.... however many people however long he needed them, they were going to provide it," and that her understanding of the agreement was "completely accurate." Taylor approved the $200,000 loan to the plaintiff on October 13, 1994, with the understanding that the signed letter of intent was a definitive agreement between the two parties.

In late 1994, Lindsey left Dyno. Fincher left in early 1995. On June 7, 1995, Elston sent a letter to Dyno's merchants, including the plaintiff, that stated in relevant part, "We assure you that Dyno is committed to Coolant Merchants and we will continue to meet all our obligations." Busch

understood the letter to be a confirmation of the deal he had earlier reached with Dyno concerning the ethylene glycol project.

By February 1995, the $200,000 that the plaintiff had borrowed from National Bank of Detroit had been spent on plant construction and the plant was not yet complete. After consulting with Smith regarding the cost of project completion, Busch applied to the bank for a second loan of $128,000, which was approved with a second mortgage on Busch's home as collateral.

The plant was completed as designed in May 1995, but initially did not work properly. From June 1995 to April 1996, Smith worked with Noble Metal's employees to correct problems. As the plant was being adjusted. Dyno submitted new, more stringent standards for the ethylene glycol to be produced. Smith testified that the plant that he had designed was not created to meet the more stringent requirements and that he was "just furious that they would suddenly raise the bar like they did." Smith and Busch continued to work on plant corrections, and construction costs continued to rise. After the bank denied further lending, Busch borrowed $110,000 on his personal credit cards to finance the plant's completion.

Finally, in March 1996, Smith sent Haggard, a Dyno technical engineer, a sample of ethylene glycol made in the Plaintiff's plant and designed to meet the more stringent requirements. Haggard telephoned Smith to inform him that the sample met all of the requirements. However, when Smith attempted to schedule the next test, he was told that the defendant would not purchase the ethylene glycol "no matter

---

1. Taylor's understanding of the "total production costs" included equipment, labor, and

the cost of building the new facility.

what level specification it met" and ordered Smith to stop work on the project. Smith testified that as of April 1996, the plant was able to produce the quality and quantity of material that he had designed it to produce.

Busch called Elston in April 1996 to inform him of the plant's ability produce the ethylene glycol. However, citing "safety concerns," Elston told Busch that the defendant did not intend to purchase any of the ethylene glycol produced by the plaintiff. Busch testified that he was "stunned" by Elston's words, as he had believed that any safety concerns had been worked out previously by Fincher and Smith.

The plaintiff continued to operate the ethylene glycol plant from April 1996 through October 1997. However, Busch was unsuccessful in finding another customer to purchase the ethylene glycol. Financial losses forced the plaintiff to close the plant in late 1997.

This litigation, initially filed in state court, followed. After the plaintiff had presented its case at trial, the defendant moved for judgment as a matter of law under Fed.R.Civ.P. 50(a). The district court granted the motion, holding that there was no enforceable contract between the parties. The plaintiff now appeals that decision.

## ANALYSIS

### A. Standard of Review

We review the district court's decision on a motion for judgment as a matter of law *de novo. See K & T Enters., Inc. v. Zurich Ins. Co.,* 97 F.3d 171, 175 (6th Cir.1996). In diversity cases, the propriety of such a ruling based upon the sufficiency of the evidence is governed by the law of the forum state. *See Preceptron, Inc. v. Sensor Adaptive Machines, Inc.,* 221 F.3d 913, 918 (6th Cir.2000). Under Michigan law, judgment as a matter of law is appropriate when the facts presented provide no opportunity for reasonable minds to differ as to the conclusion to be drawn from the evidence. *See Kubisz v. Cadillac Gage Textron, Inc.,* 236 Mich. App. 629, 634–35, 601 N.W.2d 160 (1999). In considering contract claims implicating construction of Uniform Commercial Code provisions, it is the obligation of this court, sitting in diversity, "to make a considered 'educated guess' as to what conclusion would most likely be reached on the issue by the Michigan Supreme Court, on the basis of the present state of the Michigan law as well as that of other jurisdictions." *Wells v. 10–X Manufacturing Co.,* 609 F.2d 248 (6th Cir.1979).

### B. Existence of a Contract

The plaintiff's first claim of error concerns the district court's summary determination that the letter of intent was merely an "agreement to agree," rather than an enforceable contract. The existence of a contract is, of course, contingent upon whether the parties reached a meeting of the minds sufficient to create a binding agreement. *See Fisk v. Fisk,* 328 Mich. 570, 574, 44 N.W.2d 184 (1950). In determining this question, our principal aim is to ascertain the intention of the parties through exploration of objective manifestations of that intent. *See D'Avanzo v. Wise & Marsac, PC,* 223 Mich.App. 314, 319, 565 N.W.2d 915 (1997); *Sprague v. General Motors Corp.,* 843 F.Supp. 266 (E.D.Mich.1994), *aff'd in relevant part,* 133 F.3d 388 (6th Cir.1998) (court must be concerned with objective manifestations of this intent and not with subjective, hypothetical, unexpressed, or nonexistent intentions of the parties); *see also Siegel v. Spinney,* 141 Mich.App. 346, 350, 367 N.W.2d 860 (1985) (a meeting of the minds is judged by an objective standard). An

enforceable contract is not created unless there is mutual assent as to all essential terms. *See Eerdmans v. Maki,* 226 Mich. App. 360, 364, 573 N.W.2d 329 (1997).

In reference to the district court's linchpin finding that the letter of intent was "merely an agreement to agree," it is well to note that under Michigan law "a contract to make a subsequent contract is not per se unenforceable; in fact it may be just as valid as any other contract." *Heritage Broadcasting Co. v. Wilson Communications, Inc.,* 170 Mich.App. 812, 817, 428 N.W.2d 784 (1988). As long as the contract to enter into a future contract specifies the material and essential terms, leaving none to be agreed as a result of future negotiations, it is legally enforceable. *See id.; see also Socony–Vacuum Oil Co. v. Waldo,* 289 Mich. 316, 323–324, 286 N.W. 630 (1939).

■ Accordingly, we conclude as an initial matter that the letter of intent between Dyno and Noble Metal is not, on its face, unenforceable as an "agreement to agree." Even though the letter of intent clearly contemplates a subsequent contract, one that was never drafted, it does not fail for that reason alone. And although the letter of intent suggests that some terms of the agreement have yet to be resolved, the document elsewhere indicates that those terms have been successfully negotiated.[2] This reading of the letter of intent is supported by the years of performance by both parties that followed the drafting and signing of the letter of intent. Accordingly, we hold that the district court prematurely categorized the letter of intent as an unenforceable "agreement to agree" and should not have granted judgment as a matter of law on that ground.

## C. The Nature of the Agreement

Given that threshold determination, we must next identify the appropriate framework for determining whether the letter of intent is a written expression sufficient to create a binding and enforceable contract. If the agreement is one for the sale of goods, as held by the district court and advocated by the defendant, it must meet the requirements of the Uniform Commercial Code's statute of frauds in order to survive judgment as a matter of law on the contract claims.[3] In contrast, if the con-

---

**2.** Point two of the letter of intent provides:

The respective obligations of the parties to enter into the Agreement and to carry out the transactions hereby contemplated shall be conditioned on, among other things:
...(b) the parties agreeing to all pricing and delivery terms;
However, earlier in the body of letter a concrete formula for the price determination, along with a delivery arrangement is outlined:
(1)(b) DYNO's purchase price per pound for such Product shall be Coolant Merchants' cost of manufacture plus 15%, FOB Coolant Merchants' Wixom, Michigan, plant.
The concrete "shall" formula, combined with the industry delivery arrangement, "free on board" Wixom, evidences at least the clear possibility that price and delivery terms had been reached.

**3.** Article 2 of the Michigan Uniform Commercial Code governs relationships between parties involved in "transactions in goods." M.C.L.A. § 440.2102; *See also Home Insurance Co., v. Detroit Fire Extinguisher Co., Inc.,* 212 Mich.App. 522, 538 N.W.2d 424 (1995). "Goods" is a term of art defined as:

(1)Goods means all things (including specially manufactured goods) which are movable at the time of the identification to the contract for sale other than the money in which the price is to be paid, investment securities (article 8) and things in action...
(2) Goods must be both existing and identified before any interest in them can pass. Goods which are not both existing and identified are "future" goods. A "purported present sale of future goods or of any interest therein operates as a contract to sell." M.C.L.A. § 440.2105.

tract is primarily for the sale of services, it is not bound by Uniform Commercial Code requirements. ·

Where a contract involves a mixture of goods and services, the Michigan Supreme Court has adopted a test first set forth in *Bonebrake v. Cox*, 499 F.2d 951, 960 (8th Cir.1974), to determine whether contracts for mixed goods and services are governed by the UCC:

> The test for inclusion or exclusion is not whether they are mixed, but, granted that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved ... or is a transaction of sale, with labor incidentally involved.... A court faced with this issue should examine the purpose of the dealings between the parties. If the purchaser's ultimate goal is to acquire a product, the contract should be considered a transaction in goods, even though service is incidentally required. Conversely, if the purchaser's ultimate goal is to procure a service, the contract is not governed by the UCC, even though the goods are incidentally required in the provision of this service.

*Neibarger v. Universal Cooperatives, Inc.*, 439 Mich. 512, 534, 536, 486 N.W.2d 612 (1992). Generally, the question whether goods or services predominate in a hybrid contract is one of fact. *See Higgins v. Lauritzen*, 209 Mich.App. 266, 269, 530 N.W.2d 171 (1995). However, where there is no genuine issue of any material fact regarding the provision of the contract, a court may decide the issue as a matter of law. *See id.* at 270, 530 N.W.2d 171.

■ We conclude that the evidence presented by the plaintiff fails to create a genuine issue of material fact as to the nature of the agreement between Dyno and Noble Metal. The aim of both parties was clearly to effectuate the production and distribution of pure-grade ethylene glycol, a product. Although the creation of a manufacturing plant employing new technology to effectuate the production of ethylene glycol was a major element of the contract, the entire thrust of the arrangement was to create a ready source of ethylene glycol for the defendant's manufacturing process. Accordingly, we hold that the district properly found that the agreement should be analyzed under Michigan's Uniform Commercial Code statute of frauds provision. *See* M.C.L.A. § 440.

**D. Applying UCC § 2–201: The Statute of Frauds**

The U.C.C. statute of frauds, M.C.L. § 440.2201, provides:

> (1) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph *beyond the quantity of goods shown in such writing* (emphasis added).

> \*     \*     \*     \*     \*     \*

> (3) A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable

> (a) if the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of business and the seller, before the notice of repudiation is received and under circumstances which reasonably indicate that the goods are

for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement. . . .

Michigan courts have interpreted this provision to require that all contracts for the sale of goods, except for those that are "specially manufactured," must include a quantity term. *See e.g., Lorenz Supply Co. v. American Standard, Inc.*, 419 Mich. 610, 614, 358 N.W.2d 845 (1984); *see also,* Official Comment to UCC § 2–201 ("the only term which must appear is the quantity term.") However, an agreement for the sale of goods is "unenforceable . . . only where no quantity term at all appears. . . . Once a quantity term is found to exist in the agreement, the agreement need not fail because the quantity term is not precise." *In re Estate of Frost*, 130 Mich. App. 556, 561, 344 N.W.2d 331 (1983).

Of course, the purpose of requiring a writing with a quantity term is "to provide a basis for believing that oral evidence which is offered rests upon a real transaction. Once this purpose has been satisfied, *i.e.*, the requirements of § 2201 have been fulfilled, the question to be resolved is whether parol evidence may be admitted in order to make the agreement sufficiently definite to be enforceable." *Id.* at 561, 344

N.W.2d 331, quoted with approval by *Great Northern Packaging, Inc. v. General Tire & Rubber Co.*, 154 Mich.App. 777, 787, 399 N.W.2d 408 (1986). When there is a dispute of fact concerning the applicability of the statute of frauds, the dispute must be resolved by the jury. *See, e.g., West Central Packing Inc. v. A.F. Murch Co.*, 109 Mich.App. 493, 499, 311 N.W.2d 404 (1981).

### 1. Existence of a Quantity Term

Paragraph 1c of the letter of intent states that the plaintiff agrees to supply the defendant with "up to ten million pounds of Product per year." The plaintiff contends that although this language is imprecise as to quantity, it nevertheless can be understood in the context of the parties' dealings. In contrast, the district court adopted the defendant's position,[4] holding that the letter of intent simply failed to provide any recognizable quantity term, relying on language in introductory paragraph: "This letter confirms the intent . . . to enter into a transaction under which DYNO will purchase . . . certain of DYNO's requirements for ethylene glycol. . . ." As a result, the district court held, the absence of a quantity term voided the agreement on its face, and the parol

---

**4.** The defendant also argues that the failure to include a precise price term in the letter of intent makes it void on its face. This position is without legal or factual support. Unlike the quantity term, the price of goods for sale need not be evidenced in a signed writing. *See* M.C.L.A. § 440.2201. The defendant's reliance on UCC 2–305(4), M.C.L.A. § 440.2305(4), is misplaced because the letter of intent does not evidence an intention not to be bound if plant construction cost exceeded a given amount. Rather, the letter of intent provided a formula, cost of manufacture plus 15%, for the calculation of final costs. The failure to specify a specific dollar amount makes this cost no less certain in its expression of an agreement between the two parties. *See, e.g., Wallace Steel, Inc. v. Ingersoll–Rand*

*Co.*, 739 F.2d 112, 114 (2nd Cir.1984) (enforcing the price term in a sales contract when price was determined by a formula rather than a direct dollar amount). The evidence presented at trial, when viewed in a light most favorable to the plaintiff, established that the plaintiff believed that the parties had negotiated and agreed upon a price for both the plant construction and assistance, as well as the ethylene glycol to be produced. Dyno's permission to view Noble Metal's books in order to calculate the costs also does not effect the price so as to make it uncertain. Accordingly, the failure of the parties to capture the cost of the goods in a precise dollar amount does not void the defendant of any obligations otherwise created by the contract.

evidence rule barred the introduction of prior conversations for the purpose of clarification.[5]

■ We conclude that the district court's ruling in this regard was in error. The record before us suggests strongly that reasonable minds could construe the language "up to ten million pounds" to constitute a quantity term, albeit ambiguous and best explored through the introduction of parol evidence. It is entirely possible that "up to ten million pounds" is an ambiguous expression either of exactly ten million pounds or of some agreed-to minimum amount below ten million pounds, with an ability to increase that amount to a ceiling of ten million pounds should the need arise. Testimony by the parties to the contract of the course of performance is the best manner to "explain what in fact the parties intended to be the exact quantity." *Extrusion Painting, Inc. v. Awnings Unlimited, Inc.*, 37 F.Supp.2d 985, 995 (E.D.Mich.1999). Moreover, we note that Dyno's agents were responsible for drafting the letter of intent, and we are disinclined to allow Dyno to avoid contractual obligations by construing the ambiguity in its favor. *See, e.g., Schroeder v. Terra Energy Ltd.*, 223 Mich.App. 176, 183–184, 565 N.W.2d 887 (1997) (ambiguity in contract provisions to is be construed against the drafting party).

Having concluded that the letter of intent does not fail on its face under the statute of frauds as a matter of law, we further find that the unresolved issues involving quantity—whether the expression "up to ten million pounds" satisfies the requirements of the statute of frauds and whether the term is precise enough to allow contractual recovery—must be submitted to the jury. *See Extrusion Painting, Inc,* 37 F.Supp.2d at 955 (" 'It is well-settled that where a contract is ambiguous, such as the present case, and where its meaning must be determined by 'extrinsic unconceded facts,' construction of the contract 'is then a question of fact, or a mixed question of law and fact, for the jury' ")

Accordingly, we conclude that the testimony provided by agents of the plaintiff, along with the testimony by the bank officer concerning the representations made to her by agents of the defendant, may properly be admitted by the district court, contingent upon a finding that statute-of-frauds requirements have been fulfilled. Additionally, the plaintiff's belief that the defendant was committed to purchasing ten million pounds of ethylene glycol annually may be reenforced by testimony concerning the performance that occurred after the signing of the letter of intent.[6] Likewise, the defendant may introduce contradictory evidence at trial concerning the parties' dealings in order to persuade the jury that the language in the letter of intent expresses a failure between the parties to reach an agreement concerning quantity and, therefore, that the letter of intent is unenforceable.

**2. Specially Manufactured Goods Exception**

■ Through an examination of the testimony put forth at trial, we have also come to the conclusion that the course of dealings between Dyno and Noble Metals may evidence a contract for the sale of

5. The district court did allow some testimony concerning the meaning of the quantity term at trial, but expressed skepticism concerning its admissibility given the confines of the parol evidence rule.

6. The plaintiff purchased a large boiler, secured bank loans, and took out personal loans based on his understanding that the defendant was committed to ensuring the success of the plant project and ultimately purchasing ten million pounds of product per annum.

"specially manufactured goods," exempting the parties' agreement from any written quantity term requirement. *See* M.C.L. 440.2201(3)(a). This observation is based upon an examination of both the unique nature of the goods involved, *i.e.,* high-grade ethylene glycol meeting defined specifications provided by the defendant, and the course of performance between the parties. *See e.g., Webcor Packaging Corp. v. Autozone,* 158 F.3d 354, 356 (6th Cir.1998); *Impossible Electronic Techniques, Inc. v. Wackenhut Protective Systems, Inc.,* 669 F.2d 1026, 1037 (5th Cir. 1982). Invocation of the "specially manufactured goods" exception, which essentially operates as a rule of evidence, provides an alternate justification for the admission of parol evidence explaining the nature of the agreement between the parties. The exception is designed to promote fairness and equity between a buyer and seller where the nature of the goods under production provides sufficiently reliable evidence of the existence of a contractual relationship, making adherence to the formal requirements of the statute of frauds unnecessary. *See Webcor,* 158 F.3d at 356. Accordingly, this exception may provide an additional justification for the district court's admission of parol evidence.

The failure of the seller to raise this defense to the statute of frauds does not bar us from considering it, given the fact that the applicability of the statute of frauds was raised in the district court and that the district court granted judgment as a matter of law based, in part, upon the court's understanding of its requirements. Hence, on remand, the district court is directed to examine the applicability of the "specially manufactured goods" exception in order to determine whether admission of parol evidence establishing an oral agreement is proper. In doing so, the court should be guided by the factors set out in *Webcor:* (1) whether the goods were specially made for the buyer, (2) whether they were unsuitable for sale to others in the ordinary course of the plaintiff's business, (3) whether the seller had substantially begun the manufacture of the goods or commitment to their procurement, and (4) whether the circumstances reasonably indicate that the goods were for the buyer and were so indicated before the buyer's repudiation. *See id.,* citing the leading case of *Colorado Carpet Installation, Inc. v. Palermo,* 668 P.2d 1384, 1389 (Colo. 1983). To the extent that factual disputes surround the application of the test, the jury is charged with the duty of resolving those disputes, with the burden of persuasion placed on the seller. *See id.* Should either the trial judge or the jury determine that the ethylene glycol qualifies as "specially manufactured," that finding will obviate the need for the jury to determine if a quantity term exists in the written agreement but will not absolve the factfinder from determining what the agreed-to quantity actually was. *See* M.C.L. § 440.2201(3)(1).

**E. Plaintiff's Ability to Perform on the Contract and Defendant's Duty to Enable Performance**

In granting the motion for judgment as a matter of law for the defendant, the district court held:

> Further, the failure of [Noble Metal] to be able to produce the product in any warrantable quantity leads the Court, and the Court here finds, would lead any reasonable finder of fact to conclude that if a contract existed, [Noble Metal] was never in position to perform on that contract at any time reasonably within the contemplation of the parties. Therefore, even if the September 30th letter of intent and the circumstances surrounding it did give rise to an enforceable contractual situation, the facts presented by the Plaintiff admit of no

other conclusion than that the inability and failure of the plaintiff to perform, as a matter of law, excuses any breach by the Defendant asserted by the Plaintiff.

Pursuant to this ruling, the defendant argues on appeal that even if the letter of intent created an enforceable contract, the evidence heard by the district court established that the plaintiff was incapable of performing on the contract and, therefore, that the plaintiff's case must be dismissed. The defendant contends that the plaintiff's ability to perform by delivering warranted high quality ethylene glycol was a condition precedent to their duty to perform on the contract.

██ We conclude, contrary to the district court's determination, that there is a material dispute of fact both as to the nature of obligation of the plaintiff to perform under the contract and also as to the plaintiff's ability to perform on the contract before repudiation by the defendant. Given the testimony put forth by the plaintiff at trial, a reasonable jury could have concluded that Noble Metal was able to perform on the contract by April 1996. Busch testified that in April 1996, the plaintiff could meet Dyno's ethylene glycol specifications but that Elston, the defendant's agent, told him that the defendant would not use the material, "no matter what level of specification it met." Busch also testified that the plant was capable of producing high quality ethylene glycol in 1996 and 1997, after the early problems with color and plant volume capabilities had been solved. Smith also testified that the plant was capable of producing the amount of ethylene glycol contracted for, but admitted that the plant did not run smoothly and often was shut down for days at a time after plant malfunctions.

Based on our review of the record, which reflects several disputes of fact that are material to the resolution of the conflict between the parties, we conclude that a jury must determine both the contractual obligations of each party and the status of the plaintiff's ability to perform on those obligations, in order to determine whether a constructive breach occurred in this case. Hence, we hold that the district court's order of judgment as a matter of law on this ground was premature.

F. Promissory Estoppel

The plaintiff also appeals the district court's denial of its verbal motion to amend the compliant to add promissory estoppel as a theory of recovery case after the district court had granted the judgment as a matter of law. Rule 15(b) of the Federal Rules of Civil Procedure authorizes a district judge to permit the filing of an amended pleading at any time, even after the entry of judgment, regarding issues "tried by express or implied consent of the parties ... to conform to the evidence." FED. R. CIV. P. 15(b). "This rule is designed to allow parties ... to get to the heart of the matter and not have relevant issues obscured by pleading niceties. It was not designed to allow parties to change theories midstream." *Donald v. Wilson*, 847 F.2d 1191, 1198 (6th Cir.1988). Hence, "it must appear that the parties understood the evidence to be aimed at the unpleaded issue." *Kovacevich v. Kent State University*, 224 F.3d 806, 831 (6th Cir.2000), *quoting Yellow Freight Sys., Inc. v. Martin*, 954 F.2d 353, 358 (6th Cir.1992). We review a decision to permit or deny a Rule 15(b) motion to amend for abuse of discretion. *See id.*

We hold that the district court did not abuse its discretion in denying the plaintiff's motion to amend the complaint after the presentation of the plaintiff's case, principally because the plaintiff framed the request to the district court in terms of a theory of damages rather than specifically as a theory of liability. However, on re-

mand, the district court should review the issue, provided that it is properly pleaded before commencement of the new trial.

## G. The *Daubert* Claim

Retrial will also give the district court the opportunity to review its decision to disallow testimony by Fredrich Pertner, the plaintiff's proffered expert witness on damages. Pertner's testimony was designed to inform the jury about the value of the plaintiff's business, as well as the value of lost profits resulting from the breakdown of the agreement.

Prior to trial, Pertner submitted two reports outlining his intended trial testimony. The defendant deposed Pertner after receipt of the reports and, after the deposition, filed a motion to exclude his trial testimony and strike his reports from the record. The district court granted the defendant's motion, on the following basis:

> Performing its 'gatekeeping' function under *Daubert*, the Court finds that Mr. Pertner's reports and his anticipated testimony do[ ] not rest on a reliable foundation. It further finds that the underlying reasoning and methodology is not sound or valid to the task addressed and that his conclusions are therefore speculative to the point of inadmissibility.

The court did not, however, make any specific factual findings explaining this conclusion. The plaintiff's motion for reconsideration, supported with an affidavit by Pertner, was denied, along with the plaintiff's request for a new hearing.

We review the district court's decision to exclude the testimony for abuse of discretion. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 143, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). As noted by the district court, Federal Rule of Evidence 702, is the primary source for determining the admissibility of expert testimony in federal court:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence of to determine a fact in issue, a witness qualified as an expert by knowledge, skill, expertise, training, or education, may testify thereto in the form of an opinion or otherwise.

The Supreme Court has provided guidance to lower courts in the application of Rule 702, explaining in *Daubert*, that Rule 702 has a "liberal thrust" commanding a "general approach of relaxing the traditional barriers to 'opinion' testimony." *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 588, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In this regard, the district court is charged with the gatekeeping function of determining whether the expert testimony proffered by the litigant is both reliable and relevant. *See, e.g., Jahn v. Equine Services, PSC*, 233 F.3d 382, 388 (6th Cir.2000) (discussing the nature of the assessment required by the district court in determining the admissibility of expert testimony). "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93, 113 S.Ct. 2786. Non-scientific expert testimony must be evaluated pre-trial with an equal degree of exactitude, ensuring not that the expert's testimony is "known to a certainty," but that the expert is basing the testimony on "the same level of intellectual rigor that characterizes the practice in the relevant field." *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

The "gatekeeper inquiry" under Rule 702 is a flexible determination allowing the district court to exercise discretion, but "there is no discretion regarding the actual

performance of the gatekeeper function." *Goebel v. Denver & Rio Grande Western Railroad Company*, 215 F.3d 1083, 1087 (10th Cir.2000), *citing Kumho Tire*, 526 U.S. at 157–158, 119 S.Ct. 1167. The district court may reasonably be required to create a record evidencing the nature of the determination that was made pre-trial in order to ensure that a proper assessment was in fact made in the event of an appeal. Accordingly, several of our sister circuits have charged district courts with the duty of making specific factual findings on the record explaining their decision to admit or exclude expert testimony. *See Goebel*, 215 F.3d at 1089 ("But we specifically hold that a district court, when faced with a party's objection, must adequately demonstrate by specific findings on the record that it has performed its duty as a gatekeeper."); *United States v. Lee*, 25 F.3d 997, 999 (11th Cir.1994) (encouraging district courts "to make specific fact findings concerning their application of Rule 702 and *Daubert*"). Indeed, we have emphasized that the district court, while not required to hold a formal *Daubert* hearing, is charged with the responsibility of ensuring that the record before the court is adequate. *Jahn*, 233 F.3d at 393. An adequate record is one that allows both parties the opportunity to argue the admissibility of the disputed testimony. *See id.*

■ The district court disallowed Pertner's testimony because of its lack of reliable foundation. This determination appears to have been made based upon the defendant's motion to exclude, along with some ten minutes or so of oral argument. However, the written decision of the dis-

trict court, a mere recitation of the standard to be applied to determining the admissibility of expert testimony, provides no insight into the analysis supporting the trial court's determination. Additionally, the court failed to differentiate between the expert's proposed testimony concerning the value of the business and the testimony regarding lost profits, or to address the plaintiff's affidavit answering the defendant's concerns. We thus find that the district court's ruling was not made on an adequate factual record and therefore constitutes an abuse of discretion. A thorough exploration of Pertner's methodologies, effectuated by granting a *Daubert* hearing before retrial, should clear up the possible misunderstandings between the parties concerning Pertner's methodology and allow the court to make the admissibility determination on a complete record. *Daubert*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469.

As the record now stands, the district court's failure to make any specific factual determinations explaining its conclusion that the testimony was unsound leaves us to guess which of the defendant's arguments the district court found influential, on a record that suggests that several of those arguments were directly refuted by the plaintiff. Therefore, we direct that the district court conduct a *Daubert* hearing before retrial in order to meet the full gate-keeping responsibility required under Rule 702 and *Daubert* and its progeny[7]. *See, e.g., Jahn*, 233 F.3d at 393.

### H. Contractual Good Faith and Fair Dealing

The plaintiff also appeals the district court's decision to disallow proof that the

---

7. The defendant also claims that the district court's decision to grant the judgment as a matter of law was appropriate because there was no concrete mechanism by which to calculate damages. This argument is inextricably tied to the *Daubert* ruling of the district court. 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469. Accordingly, because we find that the court's failure to grant a hearing on the expert testimony was an abuse of discretion, this issue is no longer properly before this court for review.

defendant breached a covenant of good faith and fair dealing implicit in the following provision in the letter of intent:

> DYNO will provide such technical assistance and training as DYNO determines reasonably necessary to enable [Noble Metal] Merchants to properly install and operate the equipment required to produce up to 10 million pounds of Product per year. Any additional technical assistance or training shall be at [Noble Metal] Merchants' expense.

The plaintiff argues that this provision of the contract vests discretion in DYNO that must be exercised in good faith. The plaintiff further contends that the defendant's decision to abandon the plant construction, by no longer providing technical assistance, thereby amounted to a breach of contract. The district court denied the plaintiff's argument without discussion or analysis.

Under Michigan law, breach of an implied covenant of good faith and fair dealing is actionable when "a party to a contract makes the manner of its performance a matter of its own discretion." *Burkhardt v. City National Bank of Detroit,* 57 Mich.App. 649, 652, 226 N.W.2d 678 (1975). *See also ParaData Computer Networks, Inc., v. Telebit Corp.,* 830 F.Supp. 1001 (E.D.Mich.1993). The implied good faith covenant "serves to supply limits on the parties' conduct when their contract defers decision on a particular term, omits terms or provides ambiguous terms." *Hubbard Chevrolet Co. v. General Motors Corp.,* 873 F.2d 873 (5th Cir.1989) (interpreting Michigan law).

We conclude that the provision governing technical assistance clearly vested discretion in Dyno to determine the "adequacy" of the training and technical support. Indeed, the parties do not dispute that Dyno represented itself as having superior knowledge and training related to the plant construction.

The defendant argues that the good-faith-and-fair-dealing requirement is inapplicable for two reasons: (1) the contractual language "reasonably necessary" is identical to contractual language in *ParaData,* where an implied duty was denied, and (2) the facts of the case as presented by the plaintiff preclude a reasonable jury from finding that the defendant did not act in good faith. *See ParaData Computer Networks, Inc.,* 830 F.Supp. at 1005. Both of these arguments must fail.

First, the contract provision in *ParaData* was a general "further assurances" provision. *See id.* The plaintiff in *ParaData* argued that the general contractual catchall "further assurances" clause implied a duty of good faith on the defendant to market and sell the plaintiff's product. *See id.* The court rejected this argument because it found that the catchall phrase in question was directed toward administrative obligations of performing on the contract and did not vest discretion in the defendant. Hence, although the "reasonably deem necessary" language mirrors the language in the letter of intent in this case, it does not create discretion, "the hallmark of the covenant." *Id.* at 1105. By contrast, the disputed contractual provision before us is clearly discretionary and, thus, a covenant of good faith must be implied. *See Ferrell v. Vic Tanny Int'l, Inc.,* 137 Mich.App. 238, 357, 357 N.W.2d 669 (1984) (good faith obligation applies to health club in contract that provides that health club members must follow new regulations); *Sims v. Buena Vista School Dist.,* 138 Mich.App. 426, 360 N.W.2d 211 (1984) (duty on school district to act honestly and in good faith in deciding whether to extend life insurance coverage to laid-off employees).

The defendant's second argument, that the facts preclude a reasonable jury from finding that the defendant failed to act in good faith, is also without merit. While there was evidence put on the record showing that Pierre Smith acted in good faith in his efforts to assist Noble Metal in the plant construction, a reasonable jury could find that Dyno's decision to abandon the project before the plant was fully operational violated their contractual duty of good faith. Hence, there is a genuine issue of material fact to be decided by a jury on this claim. Accordingly, the district court erred in preventing the plaintiff from developing this theory at trial.

## I. Spoliation of Evidence

The plaintiff next complains that the district court improperly denied its motion for a hearing on its allegation that the defendant had engaged in spoliation of the evidence by failing to produce documents from the files of Pierre Smith, the lead Dyno engineer on the project. The missing documents were, according to the plaintiff, in a notebook that disappeared under "suspicious circumstances." The defendant maintained that the documents in question were not mishandled and that the plaintiff's allegations were unfounded. Following the recommendation of the magistrate judge to whom the motion was entrusted, the district court denied the motion for an evidentiary hearing, but ordered the defendant to supply affidavits concerning any knowledge that Dyno's agents might have concerning the questioned documents. The plaintiff contends that this order was insufficient, that a full-blown evidentiary hearing should have been held, and that sanctions should have been imposed.

In a diversity action, "the rules that apply to the spoiling of evidence and the range of appropriate sanctions are defined by state law," *Nationwide Mutual Fire Ins. Co. v. Ford Motor Co.*, 174 F.3d 801, 804 (6th Cir.1999), and review of the district court's refusal to impose sanctions for spoliation of evidence is for abuse of discretion. *See Ingham v. United States*, 167 F.3d 1240, 1246 (9th Cir.1999); *see also Roskam Baking Co. v. Lanham Machinery Co., Inc.*, 71 F.Supp.2d 736, 749 (W.D.Mich., 1999) (under Michigan law the imposition of a sanction for spoliation of evidence is within the discretion of the trial judge).

We find no abuse of discretion here. In denying the plaintiff's motion for a hearing on spoliation, the magistrate judge found that the plaintiff failed to create a genuine factual question as to whether the deliberate destruction of evidence had occurred. Additionally, the judge noted that the plaintiff had failed to identify with any degree of precision the alleged missing documents, saying, "I don't even know what documents you are talking about. It is so generalized." It appears that the plaintiff also failed to demonstrate prejudice created by the absence of the documentation, given that all of the allegedly missing documents described by plaintiff's counsel were duplicative of the oral testimony provided by Smith at trial.

Moreover, when measured against the facts considered sufficient to constitute spoliation by the Michigan courts, the allegations in this case simply fall short. *See, e.g., Brenner v. Kolk*, 226 Mich.App. 149, 169, 573 N.W.2d 65 (1997) (finding sanctions appropriate where plaintiff, while contemplating the possibility of a lawsuit, destroyed physical evidence that was critical to the defendant's ability to mount a defense against the claim); *Citizens Ins. Co. of America v. Juno Lighting, Inc.*, 247 Mich.App. 236, 241, 635 N.W.2d 379 (2001) (finding dismissal sanctions appropriate where spoliation prevented the defendant from putting forth a defense.) Simply

stated, there was no abuse of discretion in this regard.

J.   State Law Claims Dismissed by the District Court at 12(b)(6)

The plaintiff's final claim of error concerns the district court's dismissal of two state-law claims for fraudulent misrepresentation and negligent misrepresentation for failure to state a claim under Fed. R.Civ.P. 12(b)(6).

### 1.   Fraudulent Misrepresentation

In order to properly establish a case of fraud, a plaintiff must demonstrate that (1) the defendant made a material representation;  (2) that it was false;  (3) that when it was made, the defendant knew that it was false, or made it recklessly without any knowledge of its truth;  (4) that it was made with the intention of provoking the plaintiff to act on it;  (5) that the plaintiff acted in reliance upon it;  and (6) that the plaintiff suffered injury.  *See Eerdmans v. Maki,* 226 Mich.App. 360, 366, 573 N.W.2d 329 (1997).  The representation must concern a past or existing fact.  Future promises, along with statements pertaining to future events, generally cannot form the basis for a claim of fraud.  *See Hi–Way Motor Co. v. Int'l Harvester Co.,* 398 Mich. 330, 336, 247 N.W.2d 813 (1976); *Van Tassel v. McDonald Corp.,* 159 Mich.App. 745, 750, 407 N.W.2d 6 (1987).  This is true because a future promise is actionable only if made with a present intention to not keep it.  *See Dixon v. Dixon,* 16 Mich.App. 42, 167 N.W.2d 474 (1969).  "Puffing" is also not actionable fraud.  *See Van Tassel,* 159 Mich.App. at 750, 407 N.W.2d 6.

█   Dyno's representation that they knew how to create the plant successfully and its corresponding cost estimate are best understood as promises of future capabilities.  As such, they are not actionable because Dyno representatives worked closely with the plaintiff in an effort to complete performance on the promise, only to be later disappointed by the various failings in construction and budgeting. While Dyno may have originally overstated their abilities in the purification business, the statements made are incapable of being categorized as known untruths at the time that they were made.  We thus conclude that the plaintiff has failed to identify any knowingly false statement sufficient to form the basis for a claim of fraudulent misrepresentation.

### 2.   Negligent Misrepresentation

Based on the same factual situation, *i.e.,* the alleged misrepresentations of Dyno's ability to construct an operational plant on a $250,000 budget, the plaintiff also alleges that Dyno committed the tort of negligent misrepresentation.   Under applicable Michigan law, a party commits negligent misrepresentation when it violates a duty of care and creates justifiable reliance on the part of another, to their detriment, based on information provided without reasonable care.  *See Stockler v. Rose,* 174 Mich.App. 14, 30, 436 N.W.2d 70 (1989). The threshold question in any negligence action is whether the injured party was owed a duty of care.  *See Bell & Hudson, P.C. v. Buhl Realty Co.,* 185 Mich.App. 714, 462 N.W.2d 851 (1990); *see also Moning v. Alfono,* 400 Mich. 425, 254 N.W.2d 759 (1977) (holding that questions of duty, as a prerequisite to an actionable negligence tort, are generally for the court to decide).

█   The district court correctly dismissed this claim under Michigan law, based on the plaintiff's failure to demonstrate any duty owed the plaintiff by the defendant at the time that the alleged tort was committed.  *See, e.g., Van Arnem Co.,* 776 F.Supp. at 1223.  At best, the evidence presented by the plaintiff tended to prove

that the alleged misrepresentations were made during contract negotiations. But, as noted by the district court, the efforts of one party to induce another to enter a contract do not give rise to a fiduciary duty to the other party. *See Ulrich v. Federal Land Bank of Saint Paul,* 192 Mich.App. 194, 199, 480 N.W.2d 910 ( 1991); *see also Van Arnem Co. v. Manufacturers Hanover Leasing,* 776 F.Supp. 1220, 1223 (E.D.Mich.1991) (recognizing that a contracting party cannot be required to subvert their own interests to the financial interests of the other party). Michigan does not recognize an independent tort action for a breach of an implied covenant of good faith and fair dealing. *See Ulrich,* 192 Mich.App. at 197, 480 N.W.2d 910. Accordingly, Dyno did not owe Noble Metal a duty of care sufficient to support a tortuous misrepresentation claim against them.

## CONCLUSION

For the reasons set out above, we conclude that the district court erred in granting judgment to the defendant as a matter of law, thereby aborting the trial of this case prematurely. We therefore RE-VERSE the judgment of the district court and REMAND this case for further proceedings consistent with this opinion, including, if necessary, a new trial.