SOCONY-VACUUM OIL CO., INC., *v.* WALDO.

1. CONTRACTS—AGREEMENT TO ENTER INTO A CONTRACT IN THE FUTURE—MEETING OF MINDS.

In action for breach of an agreement to make a contract, where the provisions of the deferred contract are not set out in the provisional one, or where material conditions are omitted, it is not a contract *in præsenti* because the minds have not met and may never meet.

2. SAME—RETAIL AND WHOLESALE DISTRIBUTION OF PETROLEUM PRODUCTS—FUTURE CONTRACTS.

In action of assumpsit for the price of petroleum products furnished defendant and resold by him at retail, latter was not entitled to recover on counterclaim for failure of plaintiff to

enter into contract whereby defendant was to be made wholesale distributor of plaintiff's products where terms of such proposed future contract were never determined, it is disputed as to whether location of proposed bulk station was agreed upon, and record does not set forth what the terms and conditions of the proposed contract were to be.

3. SAME—FUTURE CONTRACT MUST BE COMPLETE TO BE ENFORCEABLE. To be enforceable a contract to enter into a future contract must specify all its material and essential terms and leave none to be agreed upon as the result of future negotiations.

Appeal from Kalamazoo; Hartrick (George B.), J., presiding. Submitted April 5, 1939. (Docket No. 21, Calendar No. 40,368.) Decided June 22, 1939.

Assumpsit by Socony-Vacuum Oil Company, Inc., a New York corporation, against Albert L. Waldo for sums due for purchase of gas and oil products. Set-off and recoupment by defendant for damages for alleged breach of contract. Judgment for plaintiff. Defendant appeals. Affirmed.

*W. D. Gowans* and *Mason, Sharpe & Stratton,* for plaintiff.

*Howard, Howard & Howard,* for defendant.

CHANDLER, J.   Plaintiff, successor to the White Star Refining Company, declared on the common counts in assumpsit for the price of certain petroleum products furnished defendant and resold by the latter at retail. Defendant's answer admitted the items in question, with the exception of certain rebates claimed by him. The controversy involves the matters raised by defendant's counterclaim in which he claims damages for breach, by plaintiff's predecessor, of an alleged contract whereby he was to be made wholesale distributor of plaintiff's prod-

ucts in the city of Kalamazoo and certain territory adjacent thereto. It appears to be necessary to recite in some detail the evidence produced in support of defendant's claim.

Prior to June 15, 1933, he owned and operated a retail gasoline station in the city of Kalamazoo, from which he sold gasoline bearing the trade name "Sunoco." He claims that sometime in the spring of said year, a representative of plaintiff called upon him and attempted to induce him to abandon his contract with the Sun Oil Company and enter into a contract to distribute plaintiff's products at the retail station, and that in addition thereto he was to have the right to handle plaintiff's bulk or wholesale business in a certain specified territory. To this arrangement, defendant claims that he agreed and that a contract was consummated.

It does appear that under date of June 15, 1933, defendant leased his retail station to plaintiff for a period of four years, and executed a contract under which he was to sell Mobilgas and other petroleum products produced by plaintiff. Under date of June 20, 1933, Mr. Campbell, secretary of the plaintiff company, directed a letter to defendant in which he enclosed estimates of the cost of constructing a bulk station and made recommendations as to the specifications thereof. The letter said:

"I am sorry that Mr. Coffin is not here this week as we are all extremely anxious to enter into the final arrangement whereby this company will look to you in that territory as our exclusive representative."

Mr. Coffin was president of the White Star Refining Company at that time. On July 5, 1933, defendant received another letter from Mr. Campbell, stating that Mr. Coffin would be in Kalamazoo for an interview on the following Friday. This letter stated:

"We hope that it will be possible for us to sit down with you and arrange definitely the matters we have had under discussion so that we may get started at the earliest possible moment."

On the same day, a telegram was received from Mr. Coffin, announcing his intention of being in Kalamazoo on Friday. Thereafter, several telegrams passed between the parties relative to a proposed meeting between defendant and Mr. Coffin. Finally, Mr. Campbell came to Kalamazoo, accompanied by other representatives of the plaintiff, at which time the parties inspected several possible locations for a bulk station, including a site already in use for such a purpose known as the Mastenbrook property. Defendant says he finally decided on the Mastenbrook station, and that it was also agreeable to Mr. Campbell. Plaintiff argues that a site was never agreed upon. Defendant obtained a lease on this property for a period of time, and later, after negotiations with plaintiff were terminated, obtained what is claimed to be an option to purchase, dated March 6, 1934. He admits, however, that no consideration was paid by him therefor, and the trial court characterized the alleged option as one which had been obtained for "exhibition" purposes.

On August 1, 1933, defendant received a letter from Mr. Coffin, in which he said:

"I did not get a clear picture in my own mind of what was involved until the first visit I had with you in Kalamazoo. After that visit, the more I thought about the situation, the more I felt that it would be exposing you and Charles to certain very definite risks in this business of urging you to go into the wholesale distribution of gasoline without some understanding of the many problems that are involved in the operation of such a business. Since that time the National Recovery Act has come into the foreground and we do not yet know what its provisions

will mean so far as the operation of our business is concerned, and this applies equally well to the business of our distributors.  * * *

"You have told me that certain representations were made to you in the beginning by our sales organization which contemplated your going into the wholesale distribution of gas immediately.  I have no reason to question these statements on your part and accept them in good faith.  Nevertheless, I feel that the man who sold you on this program didn't have the right visions of the problems involved in conducting a business of that character, particularly in view of the fact that you and Charles, upon whom you will have to rely largely, have had no background in the wholesale end of the business."

In the same letter it was suggested that defendant's son, Charles, be sent to Detroit where he would be trained in the business by plaintiff.  In accordance with the suggestion, Charles did go to Detroit where he was employed for a period of 18 months.

On June 22, 1934, defendant cancelled his retail contract by the following letter:

"Your Mr. Campbell and Mr. Kroeze were here today and advised me that your company had refused to complete our agreeing to arrangement and contract for the bulk distribution in Kalamazoo county, the one contract hinging on the other.  Accordingly will you please cancel all contracts at this time and send me immediate confirmation."

It is defendant's contention, at one point in his testimony, that his arrangements with the Sun Oil Company were entirely satisfactory and that he changed to the sale of plaintiff's products at his retail station only because it was also, at the same time, agreed that he should be the wholesale distributor. However, at another point in his testimony, he said:

"February 10, 1933, I wrote the Sun Oil Company that my business relations with them were not satis-

factory, and that I was thereby giving them notice of termination of my contract, on account of the reduced margin of profit. I didn't cancel my relationship and end my relationship with the Sun Oil Company because of any inducements that had been made to me to cancel it by the plaintiff company.''

In any event, he claims that he was at all times ready to enter into a contract relative to the wholesale business but that plaintiff ''stalled,'' and finally refused to carry out its agreement.

As opposed to this testimony, Mr. Coffin testified that plaintiff was anxious to have defendant execute the wholesale contract, but that he refused to do so. And it does appear that two types of proposed contracts were left with defendant to examine and decide which he wanted to adopt. However, he at no time executed either form. Mr. Coffin also claimed that defendant stated that he was not in a position to finance the construction of a bulk station, and that thereupon the matter was dropped, at least until such time as defendant could present the necessary financial qualifications, and that in the meantime it was suggested that defendant's son, Charles, come to Detroit and learn the wholesale business. Defendant never became the wholesale distributor and plaintiff eventually established its own bulk station in Kalamazoo.

The case was tried without a jury, the court entering judgment for plaintiff and dismissing defendant's counterclaim, from which action this appeal is taken.

Defendant contends that as a result of the negotiations which transpired, one agreement was consummated which contained three major provisions; he was to terminate his contract with the Sun Oil Company, and in consideration thereof, plaintiff was to grant him the right to distribute its products at retail, and also to enter into a jobber's contract. He

argues that the agreement was breached by the failure of plaintiff to perform its promise pertaining to the wholesale or jobber's contract.

Fully examined, it will be seen that the negotiations, according to defendant, resulted in an oral understanding that if he discontinued the marketing of Sunoco gasoline at his retail station, he would be offered two separate and distinct contracts; one pertaining to the sale of plaintiff's products at retail, and the other to sales at wholesale. The first-mentioned contract was reduced to writing, executed, and defendant performed thereunder for some period of time. The last-mentioned agreement, however, clearly was never completed as defendant did not become the wholesale distributor. As to why the wholesale contract was never consummated, disagreement arises. Plaintiff claims that it was because defendant was not financially able to prepare himself for performance. Defendant claims that he was ready and able at all times to complete the contract, but that plaintiff refused to do so because it had later discovered that it would be more profitable for the company to establish its own bulk station.

Stripped of conflicting contentions and arguments, defendant's counterclaim, construed as favorably to him as possible, is found to be based upon an alleged breach by plaintiff of an agreement to make a contract. Of such agreements, it is said in *Peer v. Hughes,* 25 Ariz. 105 (213 Pac. 691):

"The instruments sued on is what is known as an agreement to make an agreement. Such agreements are usually provisional or temporary, it being the intention at some later date to set out in a more formal way the terms and conditions of the proposed agreement. If all the conditions of the postponed agreement are specified in such agreement, it is an agreement *in præsenti. McKell v. Railway Co.,* 99

C. C. A. 109 (175 Fed. 321, 20 Ann. Cas. 1097).  But where the conditions of the deferred contract are not set out in the provisional one, or where material conditions are omitted, it is not a contract *in præsenti,* because the minds have not met and may never meet."

See, also, *Hi-way Motor Co.* v. *Service Motor Co.,* 68 Utah, 65 (249 Pac. 133); *St. Louis & S. F. R. Co.* v. *Gorman,* 79 Kan. 643 (100 Pac. 647, 28 L. R. A. [N. S.] 637); *Sibley* v. *Felton,* 156 Mass. 273 (31 N. E. 10); *Shepard* v. *Carpenter,* 54 Minn. 153 (55 N. W. 906).

Applying these principles to the instant case, it must be said that although plaintiff may have agreed to enter into a contract at a future date, no action arises for the breach of the agreement as the terms of the proposed future contract were never determined.  It is a subject of dispute as to whether even the location of the proposed bulk station was agreed upon, and the record contains no intimation as to what the terms and conditions of the contemplated contract were to be.  That there was no meeting of the minds on the terms of the future contract is forcibly illustrated by defendant's testimony, wherein he said: "We didn't come to a point of finishing details of any kind in the bulk business."

Defendant was given copies at some time during the negotiations of two different forms of wholesale contracts.  He claims that he decided as to which one he wanted to adopt.  Assuming this to be true, however, it does not appear that his selection was communicated to plaintiff, and obviously, in the absence thereof, a contract did not arise.

"To be enforceable, a contract to enter into a future contract must specify all its material and essential terms and leave none to be agreed upon as the

result of future negotiations." 12 Am. Jur. p. 521, § 24.

The judgment is affirmed, with costs to plaintiff.

Butzel, C. J., and Wiest, Bushnell, Sharpe, Potter, North, and McAllister, JJ., concurred.