*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

NINO SALVAGGIO INVESTMENT COMPANY LTD.,

Plaintiff-Appellant,

v

WILLIAM BEAUMONT HOSPITAL, INC.,

Defendant-Appellee.

UNPUBLISHED
August 3, 2023

No. 362212
Oakland Circuit Court
LC No. 2020-182616-CB

Before: GADOLA, P.J., and MURRAY and MALDONADO, JJ.

PER CURIAM.

Plaintiff, Nino Salvaggio Investment Company Ltd., appeals as of right the trial court's order granting defendant William Beaumont Hospital, Inc.'s motion for summary disposition, under MCR 2.116(C)(10) (no genuine issue of material fact). We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

This matter stems from the parties' failed negotiations concerning plaintiff, a specialty grocer, leasing a concession space at Beaumont Hospital in Royal Oak and a grocery space adjacent to the hospital within Woodward Corners Development, also owned by defendant. At all relevant times, Carolyn Wilson was defendant's Chief Operating Officer, and plaintiff was owned in part by Leonard Salvaggio.

In 2016, Arkan Jonna, owner of Tower Construction (which is affiliated with defendant), approached Michael McInerney, an attorney and owner of MKM Consulting, Inc., which represents plaintiff. According to McInerney, Jonna wanted to discuss plaintiff becoming defendant's "anchor grocer tenant at its yet-to-be developed Woodward Corners [Development] space." Tower Construction was "to build the core and shell for all the buildings on the property," while Hobbs + Black Architects would design the Woodward Corner Market building. David Schostak, the President and Chief Executive Officer for Schostak Brothers and Company, and Jonna were "essentially the leasing agents" for defendant.

Leonard and plaintiff's other owners agreed they would pursue the opportunity with defendant. At some later point, the parties began negotiating the terms of a letter of intent (LOI) and reviewing design concepts for the Woodward Corner Market building. Additionally, plaintiff "insisted on, and [defendant] agreed, that [plaintiff] would [also] . . . be the exclusive tenant for [a] concession space across the street at the Beaumont Hospital. . . ." According to plaintiff's representatives, they were repeatedly assured by defendant's representatives that plaintiff was the selected grocer, which prompted Leonard to approve the creation of a commissary. The commissary would serve to "centralize certain functions within the stores and to create capacity for the two operations" within Woodward Corner Market and the hospital concession space.

On February 2, 2018, Ronald Henry, defendant's then Vice President of Real Estate, Design, and Construction, sent an e-mail to Justine O'Brien and Thomas Litzler, who worked for Schostak Brothers. David and Jonna were cc'ed on the e-mail, which stated:

> This email is official notification that [defendant] has approved [plaintiff] as the Grocer for Woodward Corners at Beaumont. The lease rate shall be $15/[square foot]. Please proceed with finalizing the[] LOI and let me know when you are ready to engage outside counsel or [defendant's] counsel . . . to begin lease negotiations. Also, please notify the design and construction team so they can begin detailed design documents for the . . . building. On a similar yet separate note, we will also need to begin discussions with [plaintiff] for leasing the space currently occupied by Papa Joe's in the near future. Once the [plaintiff's] schedule is defined and we have an idea on when the store will be completed we can then work to determine timing on the work required in the South Tower to allow [plaintiff] time for renovation.

Henry forwarded the February 2, 2018, e-mail to McInerney. A short time later, on February 28, 2018, a confidentiality and nondisclosure agreement (NDA) was executed, which provided that neither party could identify the other party "in any announcement, publication, publicity, promotional, or advertising material concerning the existence or terms of this Agreement without the express prior written consent of that other party." Negotiations concerning the LOI continued, and although it is disputed who was to blame for the delay in the execution of the LOI, it was ultimately executed on June 21, 2018. It contained several terms concerning the Woodward Corner Market lease, but the parties agreed those terms were not binding and were contingent upon defendant's approval of plaintiff's financial information and execution of a lease. The LOI also contained a clause entitled "**CONCESSION LEASE EXCLUSIVITY**" (exclusivity clause), which stated:

> [Plaintiff] shall have the exclusive right to negotiate and enter into a lease with [defendant] to provide a food and beverage concession within Beaumont Hospital-Royal Oak North Tower ("Concession Lease Exclusivity"). The Concession Lease Exclusivity shall begin upon the execution date of this letter and expire on the 90th day following the execution date of the lease for the Premises ("Concession Lease Exclusivity Period"). Upon expiration of the Concession Lease Exclusivity Period, [defendant] shall have no further obligation to [plaintiff] for space within Beaumont Hospital—Royal Oak North Tower location.

It was further agreed the terms of the LOI were "subject to" the NDA, and that the exclusivity clause concerning the concession space was binding.

After the LOI was executed, Wilson wanted to announce the deal publicly. Plaintiff's representatives declined because of a concern that plaintiff's reputation would be harmed if the deal was not completed. The parties began negotiating the terms of the lease agreement for the Woodward Corner Market building and discussed changes to the building's size and design. Although defendant's representatives wanted to execute a lease by July or August 2018, plaintiff's representatives elected to move at a "reasonable pace," and were concerned that they were not being provided with necessary cost information to complete the lease agreement for the Woodward Corner Market building.

A meeting was held on September 6, 2018, to address the lack of progress and the parties' concerns. During the meeting, Leonard expressed frustration and a desire to re-negotiate certain terms in the LOI and potentially re-open the planned unit development (PUD) with respect to the Woodward Corner Market building. Two weeks later, "an all hands meeting" was held. Leonard, who was present, found the tone of defendant's representatives to be "insulting," and he knew "something wasn't right." At the meeting, it was agreed plaintiff would accept "a smaller footprint" so defendant's representatives could avoid the timely re-submission of the PUD to Royal Oak officials. This concession was based on certain design changes to the Woodward Corner Market building. Plaintiff's representatives were also provided with additional cost information.

Although some progress had been made, Wilson decided to negotiate with Meijer Inc., which defendant had previously considered for the grocer at Woodward Corner Market. According to Henry, Wilson instructed him to "negotiate and expedite . . . with Meijer[]," and to not inform plaintiff about this. Henry was instructed to "drag [plaintiff] along" in the event the negotiations with Meijer were unsuccessful. Wilson told Henry to tell plaintiff that defendant was "still reviewing" matters if he was asked for updates. Henry testified he complied with Wilson's instructions, even though doing so made him "very uncomfortable" because he knew plaintiff was "purchasing advanced long lead items" in anticipation of reaching an agreement with defendant. Henry told his staff, Litzler, Jonna, and David about Wilson's instructions. Meanwhile, in October 2018, plaintiff's representatives met with representatives from Hobbs + Black Architects to discuss the building design. Plaintiff also completed the commissary, at an alleged total cost of $943,735.83.

Wilson terminated Henry's employment in January 2019. Thereafter, Meijer and defendant executed a lease agreement for Woodward Corner Market, which was publicly announced one month later. Although defendant's representatives had gone "radio silent" in the time leading up to the announcement, Leonard was still surprised.

Plaintiff subsequently filed suit against defendant, alleging (1) breach of contract with respect to the exclusivity clause and the NDA, (2) fraudulent misrepresentation, (3) silent fraud, (4) negligent and innocent misrepresentation, and (5) promissory estoppel.

After the close of discovery, defendant moved for summary disposition under MCR 2.116(C)(10). In relevant part, defendant argued that: (1) the exclusivity clause lacked material terms and was unenforceable; (2) plaintiff could not present substantively admissible evidence to support breach of the NDA; (3) plaintiff's alleged reliance on statements made by defendant's representatives was unreasonable; (4) it did not owe plaintiff a duty to disclose that it was

-3-

negotiating with Meijer, and (5) plaintiff's promissory estoppel claim failed because defendant did not make definite and clear promises to plaintiff. Plaintiff opposed the motion, arguing genuine issues of material fact existed for trial.[1] The trial court waived oral arguments and granted summary disposition in favor of defendant under MCR 2.116(C)(10). This appeal followed.

## II. STANDARDS OF REVIEW AND RELEVANT AUTHORITY

We review "de novo a trial court's decision on a motion for summary disposition." *Bailey v Antrim Co*, 341 Mich App 411, 421; 990 NW2d 372 (2022) (quotation marks and citation omitted). "De-novo review means that we review the legal issue independently, without deference to the lower court." *Bowman v Walker*, 340 Mich App 420, 425; 986 NW2d 419 (2022) (quotation marks and citation omitted).

> A motion under MCR 2.116(C)(10) . . . tests the factual sufficiency of a claim. When considering such a motion, a trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion. A motion under MCR 2.116(C)(10) may only be granted when there is no genuine issue of material fact. A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ. [*El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019) (quotation marks and citations omitted; emphasis omitted).]

"[A]ffidavits, depositions, admissions, or other documentary evidence may be submitted by a party to support or oppose the grounds asserted in [a] motion" for summary disposition. MCR 2.116(G)(2). However, such evidence "shall only be considered to the extent that the content or substance *would be admissible as evidence* to establish or deny the grounds stated in the motion." MCR 2.116(G)(6) (emphasis added). "The trial court is not permitted to assess credibility, weigh the evidence, or resolve factual disputes, and if material evidence conflicts, it is not appropriate to grant a motion for summary disposition under MCR 2.116(C)(10)." *Ass'n of Home Help Care Agencies v Dep't of Health & Human Servs*, 334 Mich App 674, 684 n 4; 965 NW2d 707 (2020) (quotation marks and citation omitted).

We review de novo questions involving the existence and interpretation of a contract. *Kloian v Domino's Pizza, LLC*, 273 Mich App 449, 452; 733 NW2d 766 (2006). In doing so, we keep the following principles in mind:

> [T]he main goal in the interpretation of contracts is to honor the intent of the parties. This is done by giving the plain and unambiguous words of a contract their plain and ordinary meaning. The words and phrases of the contract cannot be read in isolation, but must be construed in context and read in light of the contract as a whole. If the contract, although inartfully worded or clumsily arranged, fairly admits of but one interpretation, it is not ambiguous. [*Allen Park Retirees Ass'n,*

---

[1] Plaintiff also argued summary disposition in its favor was proper under MCR 2.116(I)(2) on the breach-of-contract claims. However, on appeal plaintiff no longer pursues that argument.

*Inc v Allen Park*, ___ Mich App ___, ___; ___ NW2d ___ (2023) (Docket No. 357956); slip op at 5 (alteration in original; quotation marks and citations omitted).]

## III.  ANALYSIS

### A.  ALLEGED BREACH OF THE EXCLUSIVITY CLAUSE

Plaintiff argues summary disposition on the breach-of-contract claim relating to the exclusivity clause in the LOI was improper because genuine issues of material fact existed as to whether the exclusivity clause was enforceable.

A valid contract requires the following elements: "(1) parties competent to contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *AFT Mich v Michigan*, 497 Mich 197, 235; 866 NW2d 782 (2015).  Mutuality of agreement requires "a meeting of the minds on all the essential terms," which is judged objectively by looking at the visible acts and expressed words of the parties.  *Kloian*, 273 Mich App at 454.  "A mere expression of intention does not make a binding contract[.]"  *Kamalnath v Mercy Memorial Hosp Corp*, 194 Mich App 543, 549; 487 NW2d 499 (1992).  "The party seeking to enforce a contract bears the burden of proving that the contract exists."  *AFT Mich*, 497 Mich at 235.

As noted earlier, the parties agreed plaintiff would have the "exclusive right to negotiate. . . a lease with" defendant "to provide a food and beverage concession within Beaumont Hospital— Royal Oak North Tower."  Plaintiff argues a question of material fact exists regarding whether this language constitutes an enforceable agreement.[2]  "A valid contract requires mutual assent on all essential terms.  Mere discussions and negotiation cannot be a substitute for the formal requirements of a contract."  *Eerdmans v Maki*, 226 Mich App 360, 364; 573 NW2d 329 (1997) (citations omitted).  However, "[a] contract to make a subsequent contract [i.e. an 'agreement to agree'] is not per se unenforceable; in fact, it may be just as valid as any other contract."  *Opdyke Investment Co v Norris Grain Co*, 413 Mich 354, 359; 320 NW2d 836 (1982).  "To be enforceable, a contract to enter into a future contract must specify all its material and essential terms and leave none to be agreed upon as the result of future negotiations."  *Socony-Vacuum Oil Co v Waldo*, 289 Mich 316, 323-324; 286 NW 630 (1939) (quotation marks and citation omitted).

> If all the conditions of the postponed agreement are specified in such agreement, it is an agreement in praesenti.  But where the conditions of the deferred contract are not set out in the provisional one, or where material conditions are omitted, it is not a contract in praesenti, because the minds have not met and may never meet.  [*Id*. at 322-323 (quotation marks and citation omitted).]

See also *Hansen v Catsman*, 371 Mich 79, 82-84; 123 NW2d 265 (1963) (finding no enforceable agreement when essential terms of building plans for a drug store were left for future negotiations and had to be "acceptable to both parties") and *Professional Facilities Corp v Marks*, 373 Mich

---

[2] Plaintiff acknowledges it only had the exclusive right to negotiate a lease with defendant.

673, 678-679; 131 NW2d 60 (1964) (providing that agreements to negotiate are unenforceable for lack of material terms). Additionally:

> When the evidence clearly shows, either by reason of definite language or otherwise, that the only (and the complete) subject matter that is under consideration is left for further negotiation and agreement, there is no contract, not for vagueness or indefiniteness of terms but for lack of any terms. The parties may use words constituting an 'agreement to agree' or an 'agreement to negotiate,' with the result that they feel a sense of 'obligation.' This is merely an obligation to discuss terms . . . not an obligation . . . to render any other future performance. [1 Corbin on Contracts § 4.1, p 531.]

It is undisputed that the exclusivity clause (1) identifies the parties (plaintiff and defendant), (2) the subject matter (the concession space lease), and (3) the date when the exclusivity clause became binding and when it expired. On its face, the exclusivity clause is an agreement to negotiate the concession space lease after June 21, 2018, which is the date the LOI was executed. However, there is no mention of several material terms, e.g., the size of the concession space, the amount of rent to be paid for the concession space, or the term of the concession space lease. See e.g., *Gedvick v Hill*, 333 Mich 689, 695; 53 NW2d 583 (1952) ("It has been held . . . that a memorandum[,] to be sufficient . . . must be complete in itself, and leave nothing to rest in parol.") (quotation marks and citations omitted); *McFadden v Imus*, 192 Mich App 629, 633; 481 NW2d 812 (1992) ("[A] writing transferring an interest in land (other than leases not exceeding one year) must be certain and definite with regard to the parties, property, consideration, premises, and time of performance.").

Here, the exclusivity clause does not contain material particulars with regard to its subject matter: the concession space lease. As such, it is merely an unenforceable agreement to negotiate rather than an enforceable agreement to agree. The trial court did not err by granting summary disposition on plaintiff's breach-of-contract claim with respect to the exclusivity provision in the LOI.

## B. ALLEGED BREACH OF THE NDA

Turning to plaintiff's other breach of contract claim, we agree with plaintiff that the trial court erred in disregarding some of the evidence proffered by plaintiff regarding breach of the NDA on the basis that it was inadmissible hearsay. But in the end, summary disposition was properly entered for defendant on this claim.

In relevant part, under the NDA the parties agreed not to "identify the other party in any announcement, publication, publicity, promotional, or advertising material . . . without the express prior written consent of that other party. . . ." To support defendant breached the NDA, plaintiff cited portions of McInerney's deposition testimony, which plaintiff claimed supported the assertion that defendant's representatives were identifying plaintiff as the grocer to attract potential tenants to Woodward Corner Development. The trial court concluded this testimony amounted to inadmissible hearsay, and disregarded the evidence. And, without that evidence, dismissed the claim because of the lack of evidentiary support.

Hearsay is a "statement," other than one made by the declarant while testifying "at the current trial or hearing," offered "to prove the truth of the matter asserted in the statement." MRE 801(c). The alleged statements all concern the fact that plaintiff was selected as the grocer at Woodward Corner Market. However, as plaintiff argues, the statements were not offered to prove the truth of the matter asserted, i.e., that plaintiff was the selected grocer. Rather, the statements were offered to prove the statements were made as an attempt to publicize the new grocery tenant. Because the alleged statements were offered for something other than to prove the truth of the matter asserted, they do not amount to hearsay. See *Hilliard v Schmidt*, 231 Mich App 316, 318; 586 NW2d 263 (1998), abrogated in part on other grounds by *Molloy v Molloy*, 247 Mich App 348, 349-350; 637 NW2d 803 (2001) ("Statements offered to show that they were made . . . are not hearsay.").

Although the deposition testimony was not hearsay, that conclusion does not yet get plaintiff over the hurdle. Instead, we agree with defendant that all of Leonard's testimony, and virtually all of McInerney's testimony, about unidentified people at a golf course or "around town" asking whether it was true that plaintiff was the selected grocer, was not admissible because of a lack of foundation. See *Detroit & Milwaukee RR Co v Van Steinburg*, 17 Mich 99, 108 (1868), and *Carden v Westinghouse Electric Corp*, 850 F2d 996, 1002 (CA 3, 1988). With one exception, none of the offered testimony creates a question of fact on whether *defendant* made public statements that plaintiff was the selected grocer in violation of the NDA. Though some of the testimony was to the effect that the "word on the street" was that plaintiff was selected as the grocer, none of that testimony linked that knowledge as having come from defendant. Nor could any deponent (again, with one exception) identify a single witness by name who could testify to this "word on the street."

However, McInerney did identify with *some* specificity about the alleged disclosure of plaintiff as the grocer. Specifically, McInerney testified that Joe Rosenberg heard from two CBRE agents that a Schostak representative named Justine said that plaintiff was going to be the grocer. Again, there is a foundational problem because the CBRE agents who allegedly repeated what "Justine" said are not identified, but at least there was more specificity in the chain of witnesses. But regardless, even considering that testimony, there still was no genuine issue of material fact that defendant did not identify plaintiff as the grocer in any "announcement, publication, publicity, promotional, or advertising material concerning the existence or terms of this Agreement." A casual remark by a real estate broker acting on behalf of defendant does not amount to an "announcement, publication, publicity, promotional or advertising material" concerning the agreement. Instead, the plain language of the NDA is focused on official-type announcements and publicity, much like what Wilson wanted plaintiff to do after the LOI was signed. But, because plaintiff did not consent as required by the NDA, the announcement was not held.

Summary disposition of this part of the breach of contract claim was proper.

## C. FRAUDULENT MISREPRESENTATION

Plaintiff also argues that summary disposition on the fraudulent misrepresentation claim was improper because genuine issues of material fact existed regarding whether plaintiff's representatives reasonably relied on the statements made by defendant's representatives.

"Michigan's contract law recognizes several interrelated but distinct common-law doctrines" that are "loosely aggregated under the rubric of 'fraud'. . . ." *Titan Ins Co v Hyten*, 491

Mich 547, 555; 817 NW2d 562 (2012). "These doctrines include actionable fraud, also known as fraudulent misrepresentation; innocent misrepresentation; and silent fraud, also known as fraudulent concealment." *Id.* In *Maurer v Fremont Ins Co*, 325 Mich App 685, 695; 926 NW2d 848 (2018), this Court reiterated the elements of fraudulent misrepresentation:

> (1) the [party] made a material representation; (2) the representation was false; (3) when the [party] made the representation, the [party] knew that it was false, or made it recklessly, without knowledge of its truth as a positive assertion; (4) the [party] made the representation with the intention that the [opposing party] would act upon it; (5) the [opposing party] acted in reliance upon it; and (6) the [opposing party] suffered damage. [*Id.*, quoting *M & D, Inc v McConkey*, 231 Mich App 22, 27; 585 NW2d 33 (1998) (quotation marks and citation omitted; alterations in original).]

A plaintiff in a fraud case must prove that any reliance on the defendant's alleged misrepresentations was reasonable. *Novak v Nationwide Mut Ins Co*, 235 Mich App 675, 690-691; 599 NW2d 546 (1999). "There can be no fraud where a person has the means to determine that a representation is not true." *Nieves v Bell Indus, Inc*, 204 Mich App 459, 464; 517 NW2d 235 (1994). Indeed, "a plaintiff cannot claim to have been defrauded where he [or she] had information available to him that he chose to ignore." *Id.* at 465. "Generally, a claim of fraud cannot be based on a promise of future conduct. An exception to this rule exists, however, if a promise is made in bad faith without the intention to perform it." *Derderian v Genesys Health Care Sys*, 263 Mich App 364, 378; 689 NW2d 145 (2004) (citations omitted).

Although plaintiff argues that Henry repeatedly made misrepresentations at the direction of Wilson, the trial court found that plaintiff could not have reasonably relied on these alleged misrepresentations. On appeal, plaintiff argues the trial court failed to acknowledge that the exclusivity clause in the LOI concerning the concession space was binding on the parties. However, the exclusivity clause is not enforceable because it lacked material terms. Moreover, the purported representations all relate to the lease agreement for the Woodward Corner Market building—not the concession space. Indeed, there is no indication the parties began to negotiate the concession space lease until after it was announced Meijer was selected as the grocer. Plaintiff does not rely on any statements that were made during these negotiations, which appear to have been brief. In sum, there is no evidence that defendant's representatives made misrepresentations concerning the concession space lease.

Instead, the alleged misrepresentations relate solely to the Woodward Corner Market lease. With respect to whether plaintiff's representatives could reasonably rely on these representations, the LOI stated:

> This Letter of Intent includes some of the basic business terms upon which [defendant] may consider entering into lease negotiations for space at the Center. Not all of the essential terms required for a lease are contained in this letter. Additional items may arise in our continuing discussions. **This proposal is expressly contingent upon (a) receipt, review and approval by [defendant] of financial statements and credit check authorization for all parties . . . (b) full execution of a lease on [defendant's] template retail lease form for the Center.**

When viewing the evidence in a light most favorable to plaintiff, the trial court did not err by concluding plaintiff failed to create a genuine issue of material fact as to whether it reasonably relied on defendant's alleged fraudulent misrepresentations. First, the parties agreed that the LOI did not constitute "a lease or an offer to lease" with respect to the Woodward Corner Market building. Rather, it was "intended to be a summary of general business terms and conditions for consideration for a formal lease." The parties also agreed that "[n]either [party] shall be bound by any terms of this [LOI] except for the Concession Lease Exclusivity and shall not incur any obligation until a formal lease has been executed by both parties." These written statements that plaintiff agreed to significantly detract from any reasonable reliance on subsequent contrary statements.

Second, while the February 2018 e-mail reflected that defendant chose plaintiff to be the grocer, it also reflected that the parties had to finalize the LOI and a lease agreement. Leonard and McInerney were aware the deal was not final until the Woodward Corner Market lease was executed. Indeed, Leonard and McInerney did not want to announce the deal publicly in July 2018 because they feared plaintiff's reputation would suffer if the parties were unable to reach an agreement. Third, the record also supports that plaintiff's representatives, including Leonard and McInerney, were trepidatious during the negotiation period and often requested reassurance from defendant's representatives. This conduct demonstrates plaintiff's representatives were well aware that plaintiff was not guaranteed a lease for the Woodward Corner Market building. For these reasons, and because "a plaintiff cannot claim to have been defrauded where he had information available to him that he chose to ignore," *Nieves*, 204 Mich App at 465, the trial court did not err in granting defendant summary disposition on this claim.

## D.  SILENT FRAUD

With respect to the silent fraud claim, the trial court dismissed it on the basis that defendant had no legal or equitable duty to inform plaintiff that it had begun negotiations with Meijer. Plaintiff argues summary disposition was improper because plaintiff presented evidence establishing that an equitable duty to disclose existed, and that defendant violated that duty.

"Michigan courts have recognized that silence cannot constitute actionable fraud unless it occurred under circumstances where there was a legal duty of disclosure." *M & D, Inc*, 231 Mich App at 29. " 'Silent fraud', also known as fraud by nondisclosure or fraudulent concealment, is a commonly asserted, but frequently misunderstood, doctrine. This is primarily because most fraud claims are based upon alleged affirmatively stated false representations of material fact." *Id*. at 28. Importantly, "[a] claim of 'silent fraud' requires a plaintiff to set forth a more complex set of proofs." *Id*. However, "courts have not hesitated to sustain recoveries where the truth has been suppressed with the intent to defraud." *Titan*, 491 Mich at 557 (quotation marks and citation omitted).

In *Maurer*, this Court explained:

> Silent fraud, also known as fraudulent concealment, acknowledges that suppression of a material fact, which a party in good faith is duty-bound to disclose, is equivalent to a false representation and will support an action in fraud. But in order for silent fraud to be actionable, the party having a legal or equitable duty to disclose must have concealed the material fact with an intent to defraud. [*Maurer*, 325 Mich App at 695 (quotation marks and citations omitted).]

A party has a legal duty to disclose a fact when he or she contractually agrees to disclose a particular fact. *M & D, Inc*, 231 Mich App at 29, 40. A party has an equitable duty to disclose a fact when the other party has directly inquired or expressed a particularized concern about a fact such that the party's silence in the face of the inquiry or concern would create a false impression. *Id*. See also *Nowicki v Podgorski*, 359 Mich 18, 32; 101 NW2d 371 (1960) ("(O)ne who remains silent when fair dealing requires him to speak may be guilty of fraudulent concealment."). The duty to disclose applies generally to fiduciaries and certain relationships, but there is no duty to disclose in the ordinary contract setting except when a party is responding to a specific inquiry. *Toering v Glupker*, 319 Mich 182, 187; 29 NW2d 277 (1947).

For example, in *Groening v Opsata*, 323 Mich 73, 77; 34 NW2d 560 (1948), when the plaintiffs considered purchasing a house built on a bluff, they asked the defendants whether the house was built too close to the bluff and whether, as a result, the house was in a dangerous position. The plaintiffs also told the defendants they had been warned the bluff was breaking off and the whole property would eventually collapse. *Id*. at 78. The defendants responded that the house was not too close and "the bluff was perfectly safe." *Id*. One year after the purchase, the bluff completely eroded, and the evidence supported the defendants knew at least two years before the sale that the bluff had been eroding. *Id*. at 76, 79.

Recognizing that "concealment of material facts that one under the circumstances is bound to disclose may constitute actionable fraud," *id*. at 83, the *Groening* Court explained that the defendants' responses created a false impression equivalent to an express and intentional misrepresentation:

> [The defendants] made replies to plaintiffs' specific inquiries, which replies did not bring forth the facts that plaintiffs were seeking to learn, but were in such form as naturally tended to reassure plaintiffs and to cause them to proceed on the assumption that the property was not in any danger from erosion. Under such circumstances the concealment of the true facts and the deliberate creating of false impressions and inferences is the equivalent of an express and intentional misrepresentation.

> * * *

> In replying to plaintiffs' inquiries concerning the property it was the duty of defendants to state the facts called for in accordance with their knowledge of the situation. Their replies were well calculated to create the impression that they were doing so. Actually, however, they were, as the jury found, guilty of misrepresentation. Such misrepresentation lay in the positive misstatements made and in the failure to give the true facts while ostensibly doing so. [*Id*. at 82, 84.]

With respect to whether defendant had a legal duty to disclose to plaintiff that it was considering Meijer to be the grocer, the LOI was not enforceable and a legal duty did not arise by virtue of the LOI. With respect to whether an equitable duty arose, evidence suggested that after the September 2018 meetings plaintiff made direct inquiries to defendant about the continued status of the contract and negotiations, and were not informed of the complete picture. Specifically, Hank Ribaris testified that in 2018 he repeatedly asked Henry "what Beaumont's intentions were and whether they had changed course or direction." This testimony is sufficient evidence to create a question of fact on whether plaintiff made a specific, particularized inquiry

about the status of negotiations. And, according to Henry, in response he failed to inform Ribaris (or anyone else) that Beaumont *had* shifted direction and was now in negotiations with Meijer to be the grocer.[3] Instead, each time McInerney or Gary Roncelli called him, Henry gave "them information that pushed it down the road" by providing "very vague statements that would keep them there, but not give them all the information. . . ." While Wilson denied she told Henry to make misrepresentations to plaintiff, we cannot assess credibility, weigh the evidence, or resolve factual disputes when reviewing a decision on a motion for summary disposition. See *Ass'n of Home Help Care Agencies*, 334 Mich App at 684 n 4.

The trial court erred by granting summary disposition on the silent fraud claim based on its conclusion that an equitable duty did not exist. Cf. *Hord v Environmental Research Institute of Mich*, 463 Mich 399, 412-413; 617 NW2d 543 (2000) (holding a duty to disclose the company's economic status, which was poor, did not exist where the plaintiff did not make inquiries about his prospective employer's financial situation).

## E. NEGLIGENT MISREPRESENTATION

We now turn to plaintiff's next argument—that the trial court erred when it granted summary disposition of its negligent misrepresentation claim based on the conclusion that defendant did not owe a duty to plaintiff.

"A claim for negligent misrepresentation requires plaintiff to prove that a party justifiably relied to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Alfieri v Bertorelli*, 295 Mich App 189, 194; 813 NW2d 772 (2012) (quotation marks and citation omitted). Like silent fraud, "negligent misrepresentation . . . require[s] a defendant to owe a duty to the plaintiff." *Id*. For the reasons discussed in detail above, plaintiff presented evidence to support that an equitable duty of disclosure existed. The trial court erred by granting summary disposition on the negligent misrepresentation claim.

## F. PROMISSORY ESTOPPEL

Finally, plaintiff argues that the trial court erred by granting summary disposition of plaintiff's promissory estoppel claim because a genuine issue of material fact existed as to whether defendant's representatives made clear and definite promises.

The elements of promissory estoppel are "(1) a promise, (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee, and (3) that in fact produced reliance or forbearance of that nature in circumstances such that the promise must be enforced if injustice is to be avoided." *Cove Creek Condo Ass'n v Vistal Land & Home Dev, LLC*, 330 Mich App 679, 713; 950 NW2d 502 (2019) (quotation marks and citation omitted). "A promise is a manifestation of intention to act or refrain from acting in a

---

[3] According to Henry, Wilson changed course after the September 2018 meeting and wanted to negotiate a grocer lease with Meijer. Henry testified that after that decision, he was instructed to "drag [plaintiff] along" in the event the negotiations with Meijer were unsuccessful. Henry testified he complied with Wilson's instructions, even though doing so made him "very uncomfortable" because he knew plaintiff was "purchasing advanced long lead items. . . ."

specific way, so made as to justify a promisee in understanding that a commitment has been made." *Zaremba Equip, Inc v Harco Nat'l Ins Co*, 280 Mich App 16, 41; 761 NW2d 151 (2008) (quotation marks and citation omitted). "In determining whether a requisite promise existed, we are to objectively examine the words and actions surrounding the transaction in question as well as the nature of the relationship between the parties and the circumstances surrounding their actions." *Novak*, 235 Mich App at 687.

"[T]he sine qua non of the theory of promissory estoppel is that the promise be clear and definite. . . ." *State Bank of Standish v Curry*, 442 Mich 76, 85; 500 NW2d 104 (1993). "[I]f the expression is made in the course of preliminary negotiations when material terms of the agreement are lacking, the degree of certainty necessary in a promise is absent." *Id*. at 86 (quotation marks and citation omitted). "[A] promise must be distinguished from a statement of opinion, a prediction of future events, or a party's will, wish, or desire for something to happen." *First Security Savings Bank v Aitken*, 226 Mich App 291, 313; 573 NW2d 307 (1997), overruled on other grounds by *Smith v Globe Life Ins Co*, 460 Mich 446, 454 n 2; 597 NW2d 28 (1999), superseded by statute as stated in *Dell v Citizen Ins Co of America*, 312 Mich App 734, 742; 880 NW2d 280 (2015).

It is undisputed that the parties planned to negotiate lease agreements for Woodward Corner Market and the concession space. This was confirmed in the February 2, 2018 e-mail. Although the statements in the February 2018 e-mail reflect defendant's wish, will, or desire to complete the lease agreements, the statements do not rise to the level of defendant's commitment to enter into leases at the time the statements were made. *First Security Savings Bank*, 226 Mich App at 316. Rather, the statements reflect that the parties needed to engage in further negotiations. As already stated, "if the expression is made in the course of preliminary negotiations when material terms of the agreement are lacking, the degree of certainty necessary in a promise is absent." *State Bank of Standish*, 442 Mich at 86 (quotation marks and citation omitted). The statements contained in the February 2018 e-mail do not constitute clear and definite promises. See *id*. at 85.

Looking beyond the language contained in the February 2018 e-mail, the language of the LOI indicates that the parties agreed that the LOI did not constitute "a lease or an offer to lease" with respect to the Woodward Corner Market building. Rather, it was "intended to be a summary of general business terms and conditions for consideration for a formal lease." The parties agreed: "Neither [party] shall be bound by any terms of this [LOI] except for the Concession Lease Exclusivity and shall not incur any obligation until a formal lease has been executed by both parties." It is also undisputed that no formal lease was ever executed, making the LOI nonbinding. Plaintiff cannot rely on a conditional promise to establish a promissory estoppel theory. See *First Security Savings Bank*, 226 Mich App at 316 (noting the "plaintiff cannot construct a detrimental reliance or estoppel theory on a conditional promise, especially when the condition did not take place") (quotation marks and citation omitted).

With respect to the statements made by defendant's representatives, Leonard, McInerney, and Ribaris testified that they were repeatedly reassured by defendant's representatives that plaintiff was the selected grocer. However, the statements that were made before the September 2018 meetings merely reflect defendant's willingness to complete a lease agreement with plaintiff for the Woodward Corner Market building. Although these statements reflect defendant's wish, will, or desire to complete the lease agreement, the statements did not rise to the level of

-12-

defendant's commitment to enter into a lease at the time the statements were made. See *First Security Savings Bank*, 226 Mich App at 316. And, even though Henry testified that he continued to reassure McInerney and Roncelli after the September 2018 meetings, it is undisputed the statements did not include the material terms of the alleged promise to complete the concession space lease or the Woodward Corner Market lease. Rather, they were empty promises that defendant was still reviewing the matter.

The language in the LOI concerning the concession space also reflected defendant's mere wish, will, or desire to complete a lease agreement. Indeed, material terms were missing, and the exclusivity clause merely constituted an unenforceable agreement to negotiate in the future. Consequently, because plaintiff failed to present evidence that clear and definite promises were made, summary disposition on the promissory estoppel claim was proper. See *State Bank of Standish*, 442 Mich at 85.[4] Given these holdings, we need not consider the remainder of the parties' arguments on appeal.

## IV. CONCLUSION

We affirm the trial court's order granting summary disposition on the breach of contract claims concerning the exclusivity clause and the NDA, the fraudulent misrepresentation claim, and the promissory estoppel claim. We reverse the trial court's order granting summary disposition on the silent fraud and the negligent misrepresentation claims, and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Michael F. Gadola
/s/ Christopher M. Murray
/s/ Allie Greenleaf Maldonado

---

[4] Plaintiff does not challenge the trial court's dismissal of its innocent misrepresentation claim.

-13-